*CJP Supp. 319 Opinion
McCONNELL, Chairperson.
I
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Peter J. McBrien, a judge of the Sacramento County Superior Court. Judge McBrien was appointed to the municipal court in 1987 and became a superior court judge in 1989. While presiding over a family law matter over a period of months, Judge McBrien engaged in a course of serious misconduct which rendered the trial fundamentally unfair, denied a litigant his due process right to complete his presentation of evidence, and culminated in the judge’s lengthy investigation of a litigant’s possible violation of the law without disclosing his actions to the parties. We conclude that a severe public censure is warranted based on the gravity of this misconduct, coupled with Judge McBrien’s pervasive lack of accountability and insight into the impropriety of his conduct.
The Commission on Judicial Performance commenced this inquiry with the filing of its notice of formal proceedings (Notice) on September 25, 2008. The Supreme Court appointed three special masters who held an evidentiary hearing and reported to the commission. The masters are Hon. Dennis A. Cornell, Justice of the Court of Appeal, Fifth Appellate District, Hon. Gail Andler, Judge of the Orange County Superior Court, and Hon. Denise de Bellefeuille, Judge of the Santa Barbara County Superior Court. Judge McBrien is represented by James A. Murphy of Murphy, Pearson, Bradley & Feeney in San Francisco, California. The examiners for the commission are Commission Trial Counsel Andrew Blum and commission assistant trial counsel Valerie Marchant.
A three-day evidentiary hearing was held in Sacramento April 1 to 3, 2009, followed by an oral argument in San Francisco on May 29, 2009. The masters’ report to the commission containing their findings of fact and conclusions of law was filed on June 23, 2009. The report includes a concurrence and dissent by Judge Andler.
*CJP Supp. 320 The Notice charges Judge McBrien in count IA[1] with the following four instances of misconduct in his handling of the dissolution matter of Carlsson v. Carlsson (Super. Ct. Sac. County, 2006, No. 04FL02489) over a period of months:
1. Terminating and abandoning the trial before Mr. Carlsson had completed his case and without offering the parties an opportunity to present additional evidence in violation of the parties’ right to due process.
2. Threatening Mr. Carlsson’s attorney, Sharon Huddle, with contempt if her client did not produce his statement of economic interests. The documents were requested by Judge McBrien even though they were not offered by either party or relevant to the proceedings.
3. Requesting a copy of the transcript of Mr. Carlsson’s testimony concerning his real estate ownership and his disclosures on his statement of economic interests and sending the transcript to Mr. Carlsson’s employer, California’s Department of General Services (DGS). Mr. Carlsson was terminated from his employment as a result of information provided by Judge McBrien. Judge McBrien continued to preside over the case without disclosing to the parties his actions with regard to the transcript.
4. Being discourteous and impatient toward Mr. Carlsson’s attorney and curtailing the parties’ right to present evidence by repeatedly threatening a mistrial if the proceedings were not concluded quickly enough.
Each of these charges has been proven by clear and convincing evidence at the hearing before the special masters. Judge McBrien’s actions constitute one instance of willful misconduct (count IA(3)), two instances of prejudicial misconduct (count IA(1) & (2)) and one instance of improper action (count IA(4)).
II
FINDINGS OF FACT AND CONCLUSIONS OF LAW
The commission, through its examiner, has the burden of proving the charges against Judge McBrien by clear and convincing evidence. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true.” {Ibid.)
*CJP Supp. 321 Factual findings of the masters are entitled to great weight because the masters have “ ‘the advantage of observing the demeanor of the various witnesses.’ ” (Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 878 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher).) The findings of fact in this decision are adopted from the factual findings of the masters which we have determined are supported by clear and convincing evidence based on our own review of the record.[2] The facts as to each count have been summarized and paraphrased from the masters’ findings.
We adopt the masters’ conclusions of law, except for count IA(2) and (3) on which we reach our own conclusions of law based on our independent review of the record and the law. (See Fletcher, supra, 19 Cal.4th at p. 878 [commission has expertise with respect to legal conclusions].)
A. Count IA( 1)—Abandoning Trial
1. Findings of Fact
The charges involve Judge McBrien’s handling of a trial in the dissolution of the marriage of Ulf and Mona Carlsson. Mrs. Carlsson was represented by attorney Charlotte Keeley and Mr. Carlsson was represented by attorney Sharon Huddle.
Judge McBrien has been assigned to the family law division of the Sacramento County Superior Court since 1989. The family law division requires attorneys to provide a time estimate when they set a matter for trial. If the estimate is for two days or less, the trial is assigned to one of the judges in the family law division. If the attorneys estimate the trial will be more than two days, the trial is sent to the master calendar in another building to be assigned to another superior court judge. Most family law attorneys in Sacramento County prefer to have their cases tried by judges in the family law division, and thus try to avoid estimates of more than two days.
Judge McBrien believed he had the discretion to declare a mistrial if the attorneys did not complete their case within the time estimate. He testified that it is “part of the general family law culture in Sacramento County” that attorneys are expected to adhere to their time estimate or make a request for *CJP Supp. 322 more time. The local rules in effect at the time of the trial in 2006 did not authorize a judge to declare a mistrial when a trial exceeded its time estimate.[3]
The Carlsson trial was estimated at two days. The disputed trial issues were child and spousal support, division of property, including the family home and a fourplex rental unit, division of Mr. Carlsson’s retirement account, and attorney fees. In the statement of issues filed before the trial, both parties requested the court to award the residence and rental property to Mr. Carlsson; however the value of the properties was a subject of dispute. On March 2, 2006, the first day of trial, Ms. Keeley filed a trial brief in which she modified her earlier appraisals of both the residence and the fourplex but still disagreed with Mr. Carlsson’s valuation of the two properties. There was also a dispute concerning a possible third party interest in the fourplex. Mr. Carlsson maintained that he had entered into a partnership agreement with Joseph Mayo on the rental property. Mrs. Carlsson disputed the partnership claim in the fourplex.
Judge McBrien presided over the Carlsson trial a full day on March 2, the morning of March 3, and the afternoon of March 9, 2006. The trial commenced at 9:18 a.m. on Thursday, March 2, 2006. Ms. Huddle, who had not filed a trial brief, advised the judge that Mr. Carlsson no longer wanted the fourplex awarded to him and wanted it sold, which would eliminate the necessity of presenting evidence on the value of the fourplex. Ms. Keeley still insisted that the fourplex be awarded to Mr. Carlsson.
As it was approaching 1:00 p.m. on the first day of trial, Ms. Huddle stated “Your Honor, I am going to have to eat.” Judge McBrien responded that he planned on “going forward” because he had another trial the next day that had “statutory preference.” He stated that he wanted to ensure that the Carlsson trial was completed by noon the next day, “Otherwise, we may as well call a mistrial right now” (Italics added.) When Ms. Huddle informed the judge she had not had breakfast and assumed there would be a lunch break, Judge McBrien stated they could take a short break, but: “All I’m telling you is if it’s not completed by noon, it’s a mistrial. . . . I’m telling you exactly what my availability is and if you want a mistrial at this point, you’re welcome to it.” (Italics added.) When Ms. Huddle reminded the judge that the matter had been set for two full days, Judge McBrien replied that she had her *CJP Supp. 323 “choices” and he was not going to give her another afternoon. Judge McBrien testified that he did not actually intend to declare a mistrial if the trial was not completed by noon the next day but threatened the mistrial to encourage Ms. Huddle to move the case along because she “never completes her case within the time estimate.”
When the trial reconvened after a short lunch recess, Judge McBrien agreed to grant Ms. Huddle’s request for an “additional” half day to try the case. In fact, the “additional” half day only enabled the parties to have two full days consistent with their trial estimate. The first day of trial recessed at 4:00 p.m., after Ms. Keeley rested her case and Ms. Huddle had called her second witness.
The trial reconvened the next morning, March 3, 2006, at 8:47 a.m. and recessed at 12:07 p.m. Although the trial was still within the time estimate, Judge McBrien continued to express his frustration with the pace of the trial. When Ms. Huddle made a request to have the matter continued to accommodate a witness who was undergoing chemotherapy, Judge McBrien responded, “/ don’t know whether this is a slow Motion for a Mistrial or what?” (Italics added.) When Ms. Huddle paused and explained that she was checking to make sure several exhibits had signatures, Judge McBrien responded, “Your time is waning, but go ahead.” (Italics added.) The trial recessed for the day at 12:07 p.m.
The trial resumed at 1:30 p.m. on March 9, 2006. At 2:18 p.m., Ms. Huddle called a real estate appraiser who testified extensively about the fair market value of the family residence and the fourplex. When Ms. Huddle requested a break to use the restroom after the appraiser’s testimony, Judge McBrien warned her that she was “approaching a mistrial.” He allowed a five-minute break, but guaranteed her that “if this is not completed by 4:30, there will be a mistrial.” (Italics added.)
At 4:09 p.m., Ms. Keeley recalled her appraiser who testified that Mr. Carlsson’s appraiser had made a miscalculation in his report which resulted in an error of $100,000 in the appraisal. At 4:27 p.m., Ms. Huddle recalled her appraiser to ask him to respond to Mrs. Carlsson’s appraiser’s criticisms. The appraiser admitted that he made a mistake in his calculations but insisted the mistake did not substantially change the property’s fair market value. As he was explaining the reasons for this conclusion, Judge McBrien interrupted and stated: “Pardon me. I have an EPO. Court is in recess.” An EPO refers to a call from law enforcement requesting an emergency protective order. Judge McBrien was on duty to receive EPO requests at the time.
*CJP Supp. 324 Judge McBrien left the bench to take the call on a mobile phone used for EPO requests. Although he does not specifically recall what occurred in this case, his normal practice is to first talk to the operator who puts him through to the peace officer making the EPO request. The phone records show that the judge received a call at 4:28 p.m., which lasted one minute and another call at 4:29 p.m., which lasted one minute and 53 seconds.
Judge McBrien believes he was still on the phone with the operator when he briefly returned to the doorway of the courtroom and the following exchange occurred:
“THE COURT: We’re going to have to adjourn this. The County operator is on the phone. This trial has ended.
“MS. HUDDLE: Your Honor, I don’t even have my client’s attorney fees costs put on.
“THE COURT: Then I’ll reserve over that issue or you can get a mistrial, one or the other.
“MS. KEELEY: We don’t want a mistrial. We’ll reserve over that issue.
“MS. HUDDLE: But your Honor, the house that we’re evaluating—
[Judge exits room]
“MS. KEELEY: We’ll arrange another date. Don’t panic.
“MS. HUDDLE: Is that what he said?
“MS. KEELEY: I’m going to ask for the him [sic] to reserve.
“THE WITNESS: May I go?
“MS. HUDDLE: Is he coming back? I’m in the middle of my examination.
“MS. KEELEY: Ms. Huddle, I’m not prepared for a mistrial.” (Italics added.)
After Judge McBrien exited the courtroom for the second time, the attorneys and parties remained with the court reporter and the clerk for about 10 to 15 minutes waiting for the judge to return. The clerk went into chambers to check on the status of the case but does not recall if the judge was still there. Eventually the clerk told the attorneys and the parties that the *CJP Supp. 325 proceedings were over. Judge McBrien never returned to the courtroom. Mr. Carlsson did not have an opportunity to rest his case.
The reporter’s transcript states that the proceedings ended at 4:29 p.m. The EPO mobile phone records show an outgoing call to Judge McBrien’s house at 4:35 p.m. that lasted one minute.
Judge McBrien testified the trial had to end by 4:30 p.m., although he conceded that the courthouse is open until 6:00 p.m. and he did not determine whether the attorneys and staff could stay beyond 4:30 p.m.
In his deposition testimony, Judge McBrien explained that he did not return to the courtroom after he completed the EPO call because there was nobody there. However, at the hearing before the masters, he acknowledged having no independent recollection of whether he looked into the courtroom to see if anyone was still there. The masters found, as do we, that Judge McBrien left the courthouse while the parties were waiting for him to return. According to the judge, he left because the parties were one minute short of receiving their two-day trial and the trial could not have concluded in one minute.
The next morning, March 10, 2006, Ms. Huddle was informed that the parties could file a three-page brief with closing arguments and a three-page brief addressing attorney fees. Mr. Carlsson’s closing brief objected to the procedure of concluding the trial with briefs because Mr. Carlsson’s redirect testimony was not concluded and rebuttal testimony was not allowed. By stipulation, the parties submitted several exhibits with their closing briefs. However, Mr. Carlsson stated in his brief that additional testimony concerning these exhibits would have supported his position concerning the division of property and his pension.
On March 30, 2006, Judge McBrien issued a decision in the Carlsson dissolution. Both properties were ordered to be sold. Mrs. Carlsson was awarded spousal support. Judge McBrien awarded each party half of the community interest in Mr. Carlsson’s retirement, and did not order a segregated account as requested by Mr. Carlsson. Attorney fees of $35,000 were awarded to Mrs. Carlsson.
The Court of Appeal, Third Appellate District, reversed Judge McBrien’s judgment and remanded the matter for a new trial in a published decision. (In re Marriage of Carlsson (2008) 163 Cal.App.4th 281, 295 [77 Cal.Rptr.3d 305] (Carlsson).) The appellate court concluded Judge McBrien rendered the trial fundamentally unfair and violated Mr. Carlsson’s due process right to a fair hearing when he “abruptly ended the trial in the middle of a witness’s testimony, prior to the completion of one side’s case and without giving the parties the opportunity to introduce or even propose additional evidence.” (Id. at p. 292.)
*CJP Supp. 326 Despite this appellate decision, Judge McBrien still does not believe that he denied Mr. Carlsson’s right to due process and a fair hearing. He points out that he provided the parties with more time in the courtroom than a normal two-day court calendar would have allowed. However, he acknowledges that he does not typically end a trial that is not completed within the time estimate without determining what additional evidence is to be presented and providing an opportunity to trail the trial to another day if he determines more time is needed. In this case, he believes it was the obligation of the attorneys to ask for additional time if needed.
2. Conclusions of Law
The masters concluded Judge McBrien violated California Code of Judicial Ethics canons 2A (judge shall respect and comply with law and act in a manner that promotes public confidence in the integrity and impartiality of judiciary) and 3B(7) (judge shall accord full right to be heard according to law) “by abandoning and terminating the trial in the middle of Mr. Carlsson’s case-in-chief, and in the middle of a witness’s testimony.” Further, the masters concluded that the judge violated Mr. Carlsson’s constitutional right to due process and a fair trial, and his actions constituted prejudicial misconduct. We concur and reach the same conclusions of law.
Prejudicial misconduct is “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” (Cal. Const., art. VI, § 18, subd. (d).) Prejudicial misconduct while acting in a judicial capacity does not require bad faith; rather, it is “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.” (Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1].)
The manner in which Judge McBrien suddenly and precipitously abandoned the Carlsson trial is manifestly unjudicial conduct prejudicial to public esteem for the judicial office. The public has a right to expect that trials will be conducted in an evenhanded and procedurally regular manner that does not “exalt efficiency over fairness.” (Elkins v. Superior Court (2007) 41 Cal.4th 1337, 1368, 1367-1369 [63 Cal.Rptr.3d 483, 163 P.3d 160].) Abruptly terminating a trial in the middle of a witness’s testimony is contrary to commonly held precepts of due process and the expectations of litigants, witnesses, and attorneys. “ ‘The term “due process of law” asserts a fundamental principle of justice which is not subject to any precise definition but deals essentially with the denial of fundamental fairness, shocking to the universal sense of justice.’ [Citation.] . . . . A prime corollary of the foregoing rule is that “A trial judge should not prejudge the issues but should *CJP Supp. 327 keep an open mind until all the evidence is presented to him.” ’ [Citation.]” (Carlsson, supra, 163 Cal.App.4th at pp. 290-291.) The Court of Appeal held Judge McBrien “openly violated these precepts.” (Id. at p. 291.) We concur.
In his testimony before the masters and in his briefs to the commission, Judge McBrien remained steadfast that he was entitled to terminate the trial the moment the parties reached their time estimate. We adamantly disagree. As the appellate court observed, conducting a trial by a stopwatch can curtail the parties’ right to present evidence on material disputed issues and lead to a denial of due process. (Carlsson, supra, 163 Cal.App.4th at p. 292.) Unexpected testimony and changing positions of the parties can alter the amount of time necessary to fairly present a case. In the Carlsson case, the parties changed their appraisals of the value of the properties and positions on who should be awarded the properties after the time estimate was given. Furthermore, Mr. Carlsson’s appraiser was shown to have made a miscalculation in his appraisal during the last hour of the last day of trial as estimated.
The question here is not a judge’s authority to set reasonable time restrictions on the presentation of evidence or to exclude irrelevant or cumulative evidence. Judge McBrien cut off the presentation of evidence without determining what remaining evidence the parties intended to present or even taking the matter under submission. As the attorneys, parties, witness, and court staff waited in the courtroom uncertain how to proceed, Judge McBrien called his residence and left the courthouse without determining if the parties were waiting for him to return.
As the masters state: “Judge McBrien was obliged to return to the courtroom after he completed the extremely brief EPO call, explain if (and why) he was going to excuse the testifying witness, advise the parties as to whether they would have the opportunity to submit additional evidence and file closing briefs, and take the case under submission. Instead, he suddenly and precipitously declared the trial was over even before he determined the nature of the EPO request, and acted in a way that was contrary to his usual practice in such a situation. The entirety of the record demonstrates that Judge McBrien was preoccupied with efficiency at the expense of ensuring a party’s constitutional right to be heard.”
In Judge McBrien’s view, it was Ms. Huddle’s obligation to affirmatively request additional time to present evidence. We find this position to be patently unreasonable under the circumstances of this case. If Judge McBrien had announced at the end of the day that he was taking the matter under submission because the parties had exceeded their time estimate, Ms. Huddle would have had the opportunity to request additional time and make a record of the remaining evidence she proposed to offer. Had her request been denied, *CJP Supp. 328 the court’s ruling could have been reviewed by a higher court. Instead, after walking off the bench to take an EPO call, Judge McBrien briefly reentered the courtroom to announce, “This trial has ended,” and walked out as Ms. Huddle was trying to explain that she had additional evidence to present. The next day Ms. Huddle was informed that she could submit closing briefs. Under these circumstances, we believe a reasonable attorney would assume that the judge had terminated the trial and would not take additional evidence. Moreover, Ms. Huddle objected to the summary termination of the trial in her closing brief and pointed out that she had additional evidence to present.
In this and each of the counts, Judge McBrien urges the commission to consider his years on the bench and limited record of discipline in determining the level of misconduct. While these facts may be taken into account in determining the appropriate level of discipline, they “[do] not mitigate or excuse willful or prejudicial conduct.” (Broadman, supra, 18 Cal.4th at p. 1112; see Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239].) In our view, his years on the bench should have provided Judge McBrien with better judgment than he exercised in terminating the Carlsson trial.
B. Count IA(2)—Threat of Contempt
1. Findings of Fact
Mr. Carlsson and Scott Moore found the fourplex at issue in these proceedings and wanted to purchase and renovate it as an investment rental property, but neither had money to buy it. Their friend Don Minkoff agreed to purchase the property and fund the cost of the renovation. Although there was no written contract, the parties orally agreed that Mr. Carlsson and Mr. Moore would renovate the property and pay Mr. Minkoff back with interest after the reconstruction was complete and they were able to refinance. The title to the property was to be held jointly by all three according to the verbal agreement. Mr. Carlsson still owed about $16,000 to Mr. Minkoff at the time of the trial, the loan was due in 2005, and Mr. Minkoff had never attempted to collect it.[4]
Mr. Carlsson met Mr. Minkoff through his job at DGS. On March 3, 2006, Ms. Keeley cross-examined Mr. Carlsson concerning the potential conflict of interest in taking a loan from Mr. Minkoff who did business with the State of California. Mr. Minkoff was a real estate developer who had contractual *CJP Supp. 329 relationships with DOS, including a contract for the lease of a building owned by Mr. Minkoff. Mr. Carlsson testified that he did not believe he had listed the fourplex or his personal investment arrangement with Mr. Minkoff on the economic disclosure forms which he was required to file with the Fair Political Practices Commission (FPPC). When Ms. Keeley completed her cross-examination, the following exchange occurred between Judge McBrien and Mr. Carlsson:
“THE COURT: Ms. Huddle? [f] First, let me, just for a point of clarification, when you said you filed this statement or document with the Fair Political Practices Board, is that a document commonly called a, ‘Statement of Economic Interests’?
“[MR. CARLSSON]: I would have to look at it. It gets thrown in front of us, we sign it, turn it in.
“THE COURT: You don’t have to complete any documents.
“[MR. CARLSSON]: There is a box where you like—whatever I have doesn’t apply, and with so many other forms that we are given, it’s just like a formality of paperwork. It just gets filed.
“THE COURT: This is filed with the Secretary of State?
“[MR. CARLSSON]: I have no idea. I give it to our Secretary and she takes care of it.” (Italics added.)
On redirect, Mr. Carlsson testified that his job did not require him to make decisions concerning any property related to Mr. Minkoff. Judge McBrien interrupted as Mr. Carlsson was testifying and the following exchange occurred:
“THE COURT: I am going to have to adjourn this proceeding. They are awaiting me downtown. So we will resume on Thursday at 1:30. [y I would ask you to bring a copy of your 2004, whatever this document is, that you filed with the Fair Political Practices Commission with the Secretary of State.
“THE WITNESS: Okay.
“THE COURT: Thank you.
“MS. KEELEY: Your Honor, would we need copies of that document for 2002 and 2003?
*CJP Supp. 330 “THE COURT: You should probably bring them for those years, but you also might want to talk to an attorney who specializes in that area because there are potential penalties far beyond what we’re talking about today.” (Italics added.)
Judge McBrien offered several explanations as to why he requested the statement of economic interests: Mr. Carlsson might have violated the Fair Political Practices Act (FPPA) if he failed to disclose Mr. Minkoff’s interests in the fourplex; the FPPC might have the power to confiscate or place a lien on the fourplex if Mr. Carlsson failed to disclose the potential conflict which would prevent the division and disposition of property; and the documents could be relevant to the value of the fourplex if they contained valuation information.
As to the last explanation, Judge McBrien conceded that the form, which he is familiar with, could not have been relevant to determining the value of the property in the dissolution case. The form provides only check boxes with ranges for such value, such as $100,001 to $1 million. Judge McBrien also admitted that he had never heard that the FPPC had the power to place a lien or confiscate property as penalty for nondisclosure. As the masters observed, Judge McBrien ruled upon the case without the statement of economic interests (which Mr. Carlsson never provided) which refutes his assertion that the documents were relevant to the pending dissolution matter. We concur, and find that Judge McBrien wanted the documents to determine whether Mr. Carlsson might have violated the FPPA, an issue that was not relevant to the proceeding before him.
When the trial reconvened on March 9, 2006, Judge McBrien asked Ms. Huddle if her client got legal advice regarding the disclosure forms. Ms. Huddle replied that she had found him a lawyer. Then the following exchange took place:
“THE COURT: Did he bring the documents with him?
“MS. HUDDLE: He never went to work. He is on disability; he doesn’t have them.
“THE COURT: So, he has violated my request to bring those documents?
“MS. HUDDLE: The way I heard you say it, it was a suggestion that he bring them.
“THE COURT: Do you want me to have the record read?
*CJP Supp. 331 “MS. HUDDLE: He would have to go to work to see if he even has a copy.
“THE COURT: Ma’am, I would suggest that he send somebody to his workplace to get those documents before we conclude this trial.
“MS. HUDDLE: Your Honor, I would like to impose an objection. I know it’s what the Court would like, but I would like to impose an objection to those records because they are irrelevant to the division of the community property—
“THE COURT: Overruled. I am not indicating that they are relevant. They are going to clarify his testimony. However, they may be relevant to other proceedings. That’s why I advised him to go and talk to independent Counsel.
“MS. HUDDLE: The independent Counsel wanted $5,000. He doesn’t have $5,000 to give him before they will talk to him. The firm is Sweeney and Greene—
“THE COURT: In any case, he can send somebody to go get those records.
“MS. HUDDLE: I am going to have to advise him to take the Fifth Amendment if there is some claim, some potential criminal action and he has been unable to discuss it with an attorney who actually knows the law. I can’t have him testify and—
“THE COURT: I think you’re too late for that.
“MS. HUDDLE: Too late?
“THE COURT: He has already testified regarding the sum and substance of that and his employer will have a copy of the documents.
“MS. HUDDLE: Are you indicating that he can’t take the Fifth Amendment now?
“THE COURT: I’m not indicating anything. Fm indicating that you need to send somebody to his employment to pick up those documents.
“MS. HUDDLE: If he is taking the Fifth Amendment, then those documents would be part of it.
“THE COURT: Those documents are on file with the Secretary of State. I could go to the Secretary of State’s Office and get a copy of them.
*CJP Supp. 332 “MS. HUDDLE: Ms. Keeley never raised this issue. If she believed it was really an issue, why didn’t Ms. Keeley get those documents? We’re here at trial now and—
“THE COURT: Ms. Huddle, you are out of the [sic] order. It was my request, not Ms. Keeley’s request.
“MS. HUDDLE: I think you would potentially, although I don’t know—
“THE COURT: Ms. Huddle, do you wish to ask your client to send somebody to get the records?
“MS. HUDDLE: If he provides those and he gets charged with something for having provided them—
“THE COURT: Yes or no?
“MS. HUDDLE: Is the Court indicating that he cannot assert his Fifth Amendment?
“THE COURT: I’m not indicating any such thing. The documents are not a part of the Fifth Amendment. It’s what he states out of his mouth that is a part of the Fifth Amendment, [f] Those are public documents at this point. They are on file—assuming they are the ones that he described—on file at the Secretary of State’s Office. As a convenience to the Court, I have asked him to bring us a copy.
“MS. HUDDLE: I suppose—this is all on the record. I don’t know what to do in a situation like this when you’re actually asking him to produce evidence which might incriminate him and it’s not even the opposing side presenting it.
“THE COURT: Ms. Huddle, am I to take that as a ‘no’placing you in the possibility of contempt?
“MS. HUDDLE: No. I will tell him to go get the records—
“THE COURT: I’m not suggesting that he needs to—
“MS. HUDDLE:—if the Court is ordering him to produce [them].
“THE COURT:—absent himself. I’m suggesting he needs to send somebody, given the fact that he hasn’t done it in the week that’s transpired to go get it so he can also attend this trial.
*CJP Supp. 333 “MS. HUDDLE: We will have to find if somebody here will go and do it and if it’s there—
“THE COURT: Ms. Huddle.
“MS. HUDDLE: I don’t know who—
“THE COURT: Ms. Huddle, you don’t need to think out loud.” (Italics & boldface added.)
At the hearing before the special masters, Judge McBrien testified that he never ordered Mr. Carlsson to provide the forms, but simply made a request or a suggestion. Judge McBrien acknowledged he did not have the authority to hold Ms. Huddle in contempt because there had not been an order. Instead, he was “explaining the landscape.” According to Judge McBrien: “That means that she’s resisting. I’m getting, for the most part, stronger and stronger in my wording. And eventually it’s going to become an ever-so-clear order, if need be, at which point if she continues her course of resistance, the possibility of contempt becomes an option.”
Judge McBrien testified that he was frustrated with Ms. Huddle’s failure to understand that she could not assert a Fifth Amendment privilege to prevent disclosure of a document that must be made available to the public. The masters concluded that while Judge McBrien may have been frustrated with Ms. Huddle’s attempted assertion of a Fifth Amendment right, this was not the reason he threatened her with contempt. We concur and find Judge McBrien threatened Ms. Huddle with contempt to compel her to produce the documents he had requested.
Ms. Huddle testified to being “extremely concerned” when Judge McBrien mentioned the possibility of contempt. She perceived his comments as a threat “that I could potentially be put in jail if I didn’t comply with what he wanted.”
2. Conclusions of Law
The masters concluded that Judge McBrien’s threat of contempt violates California Code of Judicial Ethics canon 2 which requires a judge to avoid impropriety and the appearance of impropriety and canon 3B(4) which requires a judge to be patient, dignified and courteous to all parties with whom the judge deals in an official capacity. The masters reasoned, “While the threats of contempt may have been empty, Judge McBrien violated these canons because his statements during this exchange would have been perceived as threatening contempt.” The masters determined that the conduct *CJP Supp. 334 constitutes improper action. We concur in all of the foregoing, except we determine that the wrongdoing constitutes prejudicial misconduct.
Once again Judge McBrien claims that his conduct was not inappropriate. He maintains that his words to Ms. Huddle do not constitute misconduct because a reasonable lawyer would not perceive his comments as an actual threat of contempt. The masters disagreed and so do we. In our view, an objective person would interpret the comment “am I to take that as a ‘no’ placing you in the possibility of contempt?” as a threat of contempt.
Judge McBrien concedes that he did not have authority to threaten contempt because he had not made an order. Nevertheless, he raised the possibility of contempt if Ms. Huddle failed to produce a document he had no right to order her to produce in the first place.
Threats of contempt without proper justification have been found to constitute prejudicial misconduct and willful misconduct. (Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d at pp. 846-847, 848-849 [prejudicial misconduct found where judge threatened witness with contempt for continuing to answer a question after an objection was raised, and threatened a defendant with contempt for whispering to his lawyer]; Inquiry Concerning Ross (1998) No. 141, Decision and Order Imposing Censure and Bar, pp. 5-7 [48 Cal.4th CJP Supp. 19, 26] [willful misconduct when judge threatened attorney with contempt if he said “ ‘one more word’ ” to embarrass the attorney because the judge was angry with him based on previous disputes].) The masters did not find that Judge McBrien’s statement was made in bad faith or that he actually intended to hold Ms. Huddle in contempt. Rather, they found that his words could reasonably be interpreted as a threat of contempt. Having deferred to this finding, we do not believe Judge McBrien’s conduct amounts to willful misconduct. However, raising the possibility of contempt for failure to comply with a request to produce documents that were not relevant to the proceeding reflects adversely on the judiciary and is prejudicial to public esteem for the judiciary. We conclude that Judge McBrien’s conduct constitutes prejudicial misconduct.
C. Count IA(3)—Ordering the Transcript and Sending It to Mr. Carlsson’s Employer
1. Findings of Fact
At some point after Mr. Carlsson was cross-examined concerning whether he had disclosed his loan from Mr. Minkoff on his statement of economic interests, Judge McBrien asked his clerk to have the court reporter prepare a partial transcript of that cross-examination. Judge McBrien testified that he *CJP Supp. 335 asked for the partial transcript to “ensure that what [he] thought he had heard, [he] had actually heard.” The court reporter, Robbi Joy, testified that the clerk approached her during a break in the trial and said Judge McBrien wanted the part of the transcript that dealt with Mr. Carlsson’s employment, and “he instructs you not to tell anyone.” When asked at his deposition if he instructed his clerk to tell the court reporter not to tell anyone, Judge McBrien responded, “Not to my recollection.” The clerk did not recall the judge instructing her not to tell the attorneys and could not imagine that he would make such a request. The masters found that the allegation concerning the instruction was not proven. We defer to that finding.
Although Judge McBrien requested the transcript sometime between March 3 and 10, 2006, he did not receive the transcript at that time. In May 2006, after having issued a decision in the trial, Judge McBrien made a second request for the transcript. In September 2006, Judge McBrien’s clerk called Ms. Joy and made a third request for the transcript. Ms. Joy e-mailed the transcript to the clerk’s e-mail address.
According to Judge McBrien, when he read the transcript, he was concerned that Mr. Carlsson may have violated the FPPA by not disclosing his business relationship with Mr. Minkoff. He had been thinking about the issue for some time before he received the transcript. He discussed the matter with two other judges and concluded that he had an obligation to report a possible crime and that he should send the transcript to Mr. Carlsson’s employer, DGS, rather than the FPPC. One of the judges with whom he consulted knew Linda Cabatic, the general counsel at DGS, whom Judge McBrien had had some professional contact with in the late 1970’s. Judge McBrien called Ms. Cabatic and said “words to the effect that a DGS employee had testified in court and that he was concerned about the testimony in connection with disclosure of a reporting issue.” On September 11, 2006, Judge McBrien faxed the transcript to Ms. Cabatic. This was the first time Judge McBrien had reported a litigant or attorney for possible criminal activity in any case.
Judge McBrien continued to preside over posttrial contested matters in the Carlsson dissolution case without disclosing his actions, including conducting a hearing on a posttrial motion nine days after he faxed the transcript to Mr. Carlsson’s employer. He disqualified himself on November 7, 2006, after learning DGS took disciplinary action against Mr. Carlsson.
After receiving the transcript from Judge McBrien, DGS dismissed Mr. Carlsson from his employment based on his willful failure to disclose his joint ownership of the fourplex with Mr. Minkoff.
*CJP Supp. 336 2. Conclusions of Law
The masters concluded that Judge McBrien violated California Code of Judicial Ethics canons 2 (appearance of impropriety) and 3E(2) (duty to disclose information that is reasonably relevant to question of disqualification). We concur. Further, the masters concluded that his actions in making three requests for the transcript, sending the transcript to Mr. Carlsson’s employer while telling the employer that the transcript involved a reporting matter, failing to notify the parties about his action, and continuing to preside over posttrial motions constituted prejudicial misconduct. We conclude that these actions constitute willful misconduct.
Willful misconduct is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.)
Failure to comply with the canons of the California Code of Judicial Ethics is generally considered to constitute unjudicial conduct. (Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358].)
A judge acts in bad faith “only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.)
“A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” (Broadman, supra, 18 Cal.4th at p. 1104.) Judge McBrien was acting in his judicial capacity when he requested the transcript, sent it to Mr. Carlsson’s employer, and continued to preside over posttrial matters.
Having determined that Judge McBrien engaged in unjudicial conduct in a judicial capacity, the remaining question is whether he acted in bad faith. We conclude that he did. Through his embroilment, Judge McBrien abandoned his role as a neutral arbitrator and acted for a purpose other than the faithful discharge of his duties. (See Inquiry Concerning Spitzer (2007) No. 182, Decision and Order Removing Judge from Office, pp. 19-26 [49 Cal.4th CJP Supp. 254, 275-280]; Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 535-536 [247 Cal.Rptr. 378, 754 P.2d 724].)
*CJP Supp. 337 The masters determined that Judge McBrien did not act in bad faith because he believed he had a duty as a judicial officer to report a possible violation of law. Even if we accept that this was the judge’s motivation in faxing the transcript to Mr. Carlsson’s employer, the masters concluded that “Judge McBrien’s conduct went far beyond the consideration of whether he had such a duty in this case, and that Judge McBrien engaged in an investigation during the course of the trial and post-trial period, as to whether Mr. Carlsson’s conduct violated the FPPA.”
After Mr. Carlsson was cross-examined about whether he disclosed his joint ownership with Mr. Minkoff in documents he was required to file pursuant to the FPPA, Judge McBrien independently questioned Mr. Carlsson about his statements of economic interests. The judge made a sua sponte request of Mr. Carlsson to produce the documents by the next day, and suggested that Mr. Carlsson consult with an attorney because of “potential penalties far beyond what we’re talking about today.” Before the trial ended, Judge McBrien requested a copy of Mr. Carlsson’s testimony concerning his disclosures on the statement of economic interests without notifying the attorneys. Even after the termination of the trial, Judge McBrien persisted in his efforts to obtain the transcript.
It is evident that Judge McBrien repeatedly requested the transcript and reported Mr. Carlsson to his employer for a purpose wholly unrelated to the dissolution action before him. As the masters observed, “Judge McBrien did not simply learn of a possible violation of the law by presiding over the Carlsson trial, he ‘join[ed] the fray’ through his investigation and lengthy pursuit of the issue.” (Quoting from Rothman, Cal. Judicial Conduct Handbook (3d ed. 2007) § 2.01, p. 37.) Moreover, Judge McBrien did not report Mr. Carlsson’s testimony to the FPPC, the Attorney General or the district attorney, agencies with authority to investigate a criminal violation, but instead sent the transcript to Mr. Carlsson’s employer.
We understand that Judge McBrien conferred with two other judges before making this decision. However, there is no evidence that these judges knew the extent to which Judge McBrien had become involved in investigating whether Mr. Carlsson had violated the law or knew that the judge continued to preside over contested matters in the case without disclosing his actions to the parties.
We have not ignored that Mr. Carlsson’s testimony implicated a possible violation of law. Where, as here, there are others in the courtroom who have knowledge of the potential criminal conduct revealed during the course of the proceeding, a judge is not obliged to report the crime but it is not necessarily improper for the judge to do so. (See Rothman, Cal. Judicial *CJP Supp. 338 Conduct Handbook, supra, § 5.68 at pp. 253-255.) In deciding whether to report a potential crime, a judge must be sensitive to the obligation to remain impartial. “[G]iven the enormous burden to remain impartial and be perceived as such throughout proceedings before the court, a judge could properly conclude that his or her impartiality, or the perception of same, would be impaired were he or she to initiate prosecution of those appearing before the court.” (Id. at p. 253.) Further, if the judge does report the crime, he or she must avoid “becoming an advocate” in the process of making the report. (Id. at p. 254, boldface omitted.) More importantly, a judge who reports a crime must inform the parties that such a report has been made. (Rothman, Cal. Judicial Conduct Handbook (Apr. 2008 supp.) 2006/2007 Judicial Ethics Update, § I.C.2., p. 2.)
The masters concluded that Judge McBrien became so personally embroiled as to make him unfit to conduct further proceedings. We concur. Judge McBrien has given various explanations for his failure to disclose or disqualify: he did not know whether DGS already had the information he faxed to Ms. Cabatic; he did not know for sure whether Mr. Carlsson had failed to make the necessary disclosure on his statement of economic interests; and he believed Mr. Carlsson may not have been aware of what was included on the form when he signed it because his secretary filled it out. These explanations do not excuse the judge’s failure to disclose or disqualify. Judge McBrien knew the transcript might contain evidence of improper activity by Mr. Carlsson—that is why he provided the transcript to DGS. Under these circumstances, a person aware of the facts would reasonably entertain a doubt that the judge would be able to be impartial. (Code Civ. Proc., § 170.1(a)(6)(A)(iii); Cal. Code Jud. Ethics, canon 3E(1).) As such, Judge McBrien had an obligation to disqualify regardless of whether he knew for certain whether Mr. Carlsson had violated the law or whether the agency would take action.
We conclude that Judge McBrien’s course of conduct as charged and proven in this count constitutes willful misconduct.
D. Count IA(4)—Demeanor
1. Findings of Fact
From the beginning of the trial, Judge McBrien manifested his impatience with Ms. Huddle. As reflected in the factual findings on count IA(1), the judge repeatedly threatened to declare a mistrial if the trial was not completed within the two-day estimate, even threatening a mistrial if the trial was not completed by the end of a day and a half. The masters found the mistrial threats were exclusively directed at Ms. Huddle, and were not provoked by *CJP Supp. 339 disrespectful or inappropriate conduct but “triggered by such conduct as questioning witnesses, asking for breaks when the trial went through the lunch hour, making objections, or discussing evidentiary issues.”
Judge McBrien made derogatory and discourteous remarks to Ms. Huddle independent of his .mistrial threats. He admonished her not to “think out loud” as she attempted to voice an objection. When Ms. Huddle attempted to make a record of the seriousness of her witness’s illness to explain why she had requested a continuance of his testimony, Judge McBrien admonished her that “[tjhis is not a law school class,” and she did not have to explain her motives. Ms. Huddle testified that the judge used a demeaning voice when he made this comment, as if she were being scolded. Judge McBrien testified he made the law school comment to point out that she did not have to give detailed explanations as required in law school, but admitted that someone could have perceived his comment as demeaning. All of Judge McBrien’s discourteous remarks were made in open court in the presence of Ms. Huddle’s client and the public.[5]
2. Conclusions of Law
The masters concluded that Judge McBrien violated California Code of Judicial Ethics canons 2 (appearance of impropriety) and 3B(4) (judge shall be patient, dignified, and courteous) by being discourteous to Ms. Huddle, repeatedly threatening a mistrial to pressure her to finish her case, and addressing her in a derogatory manner. They further concluded that his misconduct constitutes improper action. We concur and reach the same conclusions of law.
Although Judge McBrien may have been frustrated by the slow pace of the trial and Ms. Huddle’s lack of preparation, we agree with the masters that the “conduct of trial judges is governed by the canons, not the actions of attorneys.”
E. Mitigating Evidence
At the hearing before the special masters, Judge McBrien called numerous judges and attorneys and a licensed clinical social worker who works with the Sacramento County Superior Court family law division as character witnesses. Based on this testimony, the masters found in mitigation that Judge McBrien is extremely hard working, has played an active role in improving the family law system in Sacramento County, is respected by attorneys who *CJP Supp. 340 frequently appear in front of him and judges who serve with him, and has served as a mentor to new judges in the family law division. We adopt these findings.
F. Prior Discipline
Judge McBrien received a public admonishment in 2002 based on his misdemeanor conviction which “arose out of the 1999 cutting of trees, and removal of limbs from trees, on public land adjacent to his residence.” The admonishment states: “The trees were growing in a nature center located in a public park owned by the County of Sacramento. The trees included mature oaks, and were cut for the purpose of improving the view of a nearby river from the McBrien residence.” Judge McBrien agreed to the public admonishment pursuant to a stipulation.
As the masters state, “For reasons that are not clear, Judge McBrien felt compelled to testify extensively about the matter.” Judge McBrien testified he wanted to explain what happened in the tree incident because he had been “vilified” by the Sacramento News and Review, which called him “Chainsaw McBrien” and still portrayed him “as the Paul Bunyan of Sacramento.” He testified: “In fact, it involved one limb on one tree. And at the time that the tree was cut—by an arborist, not me personally—I did not know that it was against the law.” Further, he testified that he had the tree removed “to enhance the fire safety of our residence and the residence next to us.” When cross-examined about the language in the admonishment which stated that “trees” were cut for the purpose of improving his view, Judge McBrien testified he did not dispute the language in the public admonishment and agreed to the public admonishment “[p]robably to avoid a hearing.” (Italics added.)
After the evidentiary hearing before the masters, the parties stipulated to the examiner’s admission of additional exhibits regarding the underlying facts of the prior disciplinary matter and Judge McBrien’s admission of a written statement to clarify his hearing testimony.
The examiner introduced Judge McBrien’s sworn statement taken at a deposition in August 2001 during the investigation in the prior proceeding. The masters found that Judge McBrien’s testimony at the hearing regarding the facts underlying his prior public admonishment were inconsistent with his testimony at the 2001 deposition. We concur. At the deposition, the judge testified he observed a tree trimmer cut a limb from a tree in his backyard and later saw a limb fall from another tree after the tree trimmer got out of the tree. He also testified that he subsequently learned the trimmer had worked on five mature trees and three small trees.
*CJP Supp. 341 Judge McBrien submitted the following statement to the special masters after the hearing: “Judge McBrien’s [hearing] testimony regarding the arborist’s trimming of oak trees related to his own personal observation and not to the extent of the tree trimming activity that was the subject of the misdemeanor charge. Judge McBrien observed only one large limb cut from the oak tree in question and apologizes if there was any confusion regarding this testimony. Judge McBrien acknowledges that the limb he observed being removed was not the only cutting done by the arborist. The point Judge McBrien was attempting to make by way of his testimony was that it did not make any difference whether the oak tree was on private or public land; the prohibitory ordinance made any cutting without a permit a misdemeanor. While view enhancement was an intended effect of the trimming, the testimony of Judge McBrien on April 3, 2009 was true and correct to his best recollection.”
The masters found in aggravation that Judge McBrien gave testimony inconsistent with his prior sworn testimony regarding the underlying matter of his prior public admonishment and improperly tried to use the special masters’ hearing as a public forum to address a grievance with the media on a prior disciplinary matter. We concur.
HI
DISCIPLINE
A. Introduction
We now turn to the most difficult part of our decision, the determination of the appropriate discipline. The purpose of a commission disciplinary proceeding “ ‘is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ” (Broadman, supra, 18 Cal.4th at pp. 1111-1112, quoting Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544].) Based on the record before us and after careful consideration, we have come to the conclusion that this purpose is best served by a public censure, the second most serious level of discipline that can be imposed.
Judge McBrien’s conduct in the Carlsson case is unbefitting a judge and casts disrepute upon the judiciary. Particularly troubling is his inability to understand and accept the impropriety of his conduct as exemplified by the shifting and disingenuous explanations he has offered during the course of these proceedings. While these factors alone might warrant removal from *CJP Supp. 342 office, other considerations have persuaded us that a severe public censure is the appropriate discipline. Those considerations include mitigating factors found by the masters concerning the judge’s reputation in the legal community and contributions to the family law system in Sacramento County, a lengthy tenure on the bench without previous discipline for on-bench misconduct, and the fact that the misconduct, although serious, occurred within the context of one case.[6] We now turn to a discussion of the factors we have considered in reaching our decision.
B. Analysis of Disciplinary Factors
In reaching our decision, we have considered those factors previously identified by the commission as relevant to determining the appropriate discipline as pertinent to this case. (Inquiry Concerning Ross (2005) No. 174, Decision and Order Removing Judge from Office, pp. 63-64 [49 Cal.4th CJP Supp. 79, 138-139]; Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge from Office, p. 31 [48 Cal.4th CJP Supp. 257, 275-276]; see also Policy Declarations of the Com. on Jud. Performance, policy 7.1 [nonexclusive factors relevant to sanctions].)
1. Number of Acts and Seriousness of Misconduct.
The number of acts of misconduct is relevant to discipline to the extent it shows isolated incidents, or a pattern which demonstrates that the judge lacks judicial temperament and the “ ' “ability to perform judicial functions in an even-handed manner.” ’ ” {Fletcher, supra, 19 Cal.4th at p. 918.) In addition to the number of acts of misconduct, the nature and seriousness of the misconduct is an important factor in the commission’s consideration. (Broadman, supra, 18 Cal.4th at pp. 1112-1113; Policy Declarations of the Com. on Jud. Performance, policy 7.1(l)(b).) Judge McBrien has engaged in one instance of willful misconduct, two incidents of prejudicial misconduct, and one incident of improper action. Under the California Constitution, improper action is not a basis for censure or removal. (Cal. Const., art. VI, § 18, subd. (d).) Accordingly, we do not consider the judge’s improper action in reaching our determination to censure Judge McBrien. The remaining three instances of misconduct demonstrate a pattern of serious wrongdoing throughout the course of presiding over the Carlsson case warranting severe discipline.
*CJP Supp. 343 2. Prior Discipline.
As previously indicated, Judge McBrien was publicly admonished in 2002. The fact that Judge McBrien has engaged in subsequent serious misconduct is an aggravating factor. However, we also take into consideration that the previous discipline was for off-bench misconduct that was not similar to the misconduct in this case.
3. Appreciation of Misconduct.
“A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge from Office, p. 15 [48 Cal.4th CJP Supp. 227, 248].) Consideration of this factor weighs strongly in favor of severe discipline.
Prior to his final appearance before the commission, Judge McBrien repeatedly denied any wrongdoing or impropriety in his conduct. In his testimony before the masters, the judge expressed his view that walking out of the trial while a witness was testifying and never returning was an appropriate response to Ms. Huddle’s failure to complete her case within her time estimate. Despite an appellate decision holding to the contrary, Judge McBrien remained steadfast that he did not violate the parties’ due process rights. He views his statement to Ms. Huddle raising the possibility of contempt as “a poor choice of words” but fails to recognize that a reasonable observer could perceive his words and tone as a threat of contempt. Contrary to the masters’ conclusion, he denies becoming embroiled. He contends that he did not “join the firay” because he did not take a position on whether Mr. Carlsson violated the law, while ignoring that he testified to having “an overlying concern as to whether or not Mr. Carlsson had violated the FPPC rules,” and reported Mr. Carlsson to DOS for that reason. Finally, Judge McBrien denies being impatient with or discourteous to Ms. Huddle, despite a transcript that reflects unrelenting threats of a mistrial and multiple disparaging remarks directed exclusively at Ms. Huddle in the presence of her client.
At the hearing before the masters, Judge McBrien was asked about his statement in a letter to the commission acknowledging that he “had acted badly ... for which I deserve to be rebuked.” What he meant, he explained, is that he “acted badly” by failing to leave a complete record so that the Court of Appeal and the public would understand the reasons for his actions. When asked if he did anything else wrong in the case, he responded, “I don’t believe that I did.”
In his oral argument before the commission, Judge McBrien belatedly showed some recognition of his wrongdoing. He acknowledged that he had *CJP Supp. 344 engaged in misconduct by failing to return to the bench after taking the EPO call to determine if the parties had additional relevant evidence to present and by failing to disclose that he sent the partial transcript to Mr. Carlsson’s employer. Acceptance of responsibility at the last opportunity has limited impact after well over a year of recalcitrant excuses and denials to the masters and the commission. (Inquiry Concerning MacEachern, supra, No. 184 at p. 23 [49 Cal.4th CJP Supp. at pp. 310-311].)
4. Likelihood of Future Misconduct.
Judge McBrien’s failure to appreciate the full extent and gravamen of his misconduct indicates an inability to reform which in turn suggests a likelihood of future misconduct. However, we also recognize that a lengthy tenure on the bench with no previous discipline for on-bench misconduct and the fact that the misconduct occurred within the context of one case could suggest that the misconduct is isolated to this case rather than representing a pattern which is likely to reoccur. As such, we are not convinced that removal is necessary to protect the public from future misconduct.
5. The Judge’s Integrity and Honesty.
The misconduct itself does not involve dishonesty. However, the fact that Judge McBrien gave testimony inconsistent with his prior sworn statement concerning his prior public admonishment and provided inconsistent statements and testimony on other subjects relevant to this proceeding is a matter of concern in terms of the judge’s honesty and integrity. We have previously considered intentional dishonesty, particularly under oath, to be antithetical to the role of a judge. (Inquiry Concerning MacEachern, supra, No. 184 at pp. 19-22 [49 Cal.4th CJP Supp. at pp. 307-310]; Inquiry Concerning Ross, supra, No. 174 at pp. 68-69 [49 Cal.4th CJP Supp. at pp. 141-142].)
The masters did not make a finding that Judge McBrien gave intentionally false testimony on the subject of his prior admonishment. Although we are deeply troubled by Judge McBrien’s testimony on this subject, the question of whether it was intentionally false was not litigated to the extent that we can make this determination on our own accord in this proceeding. However, as did the masters, we consider Judge McBrien’s inconsistent testimony concerning his prior admonishment to be an aggravating factor. A judge who gives sworn testimony must take care to ensure that the testimony is truthful and accurate. Even an unintentional inconsistency in testimony creates an appearance of impropriety. This was not an area of examination that took Judge McBrien by surprise; he broached the subject on his own accord. Further, we concur with the masters’ conclusion that Judge McBrien’s use of *CJP Supp. 345 the hearing before the special masters as a public forum to address a grievance with the media on a prior disciplinary matter was highly inappropriate and constitutes an aggravating factor.
Also disturbing are Judge McBrien’s disingenuous attempts to explain why he requested Mr. Carlsson’s statements of economic interests and the transcript of Mr. Carlsson’s testimony. Even at his oral argument before the commission, he persisted in his attempt to persuade us that he thought the documents could have an impact on the valuation of the fourplex. The masters were not persuaded and neither are we. Rather, we consider the judge’s strained attempts to relate these documents to the issues before him in the trial to be another example of his refusal to accept responsibility for his wrongdoing.
Judge McBrien has provided other self-serving statements and testimony during these proceedings which have subsequently been shown to be inaccurate based on the transcripts of the Carlsson trial and other documentary evidence admitted at the hearing before the special masters. He explains these inaccuracies as being the result of his bad memory. Even if this were the case, his failure to check the record before making representations to the commission and the masters on material issues reflects an arrogant indifference toward these proceedings.
6. Impact on the Judicial System.
Judge McBrien’s misconduct has had a significant adverse impact on the judicial system. His decision in Carlsson was reversed on appeal as a result of his conduct in abandoning the trial, costing the parties substantial expense and delays. Moreover, a judge who abruptly and precipitously abandons a trial, improperly threatens contempt, inappropriately investigates potential criminal activity and sends evidence of a potential crime to a litigant’s employer while continuing to preside over the case lowers public esteem for the judiciary.
Although Judge McBrien’s misconduct in this case has adversely impacted the judicial system, we appreciate that throughout his long tenure on the family law bench he has worked to improve the family law system in Sacramento County as set forth in the masters’ findings of factors in mitigation.
ORDER
Having carefully considered and balanced the various factors that contribute to our decision, we have determined that the purpose of judicial discipline *CJP Supp. 346 as enunciated by the Supreme Court and this commission can be accomplished through a severe censure. Pursuant to the provisions of article VI, section 18 of the California Constitution, we hereby impose a severe public censure on Judge Peter J. McBrien.
Commission members Hon. Judith D. McConnell, Hon. Katherine Feinstein, Mr. Peter E. Flores, Jr., Hon. Frederick P. Horn, Mr. Lawrence Simi, Ms. Sandra Talcott, and Mr. Nathaniel Trives voted in favor of all of the findings and conclusions expressed herein and in the foregoing order of a severe public censure. Commission members Ms. Maya Dillard Smith and Ms. Barbara Schraeger concur as to the factual findings and legal conclusions expressed herein, but dissent as to the order of severe public censure and would have removed Judge McBrien from office. Commission members Mr. Marshall Grossman and Mr. Samuel Hardage did not participate in this matter.

 On the first day of the evidentiary hearing, two other counts charged in the Notice were dismissed on the motion of the examiner (Rules Com. on Jud. Performance, rule 128(b)).

 All references to the masters’ factual findings and legal conclusions are to those of the majority. The concurring and dissenting report found the examiner failed to prove count IA(4) and concluded that Judge McBrien engaged in one instance of prejudicial misconduct (count IA(1)) and two instances of improper action (count IA(2) & (3)).

 The day after the Carlsson trial ended, the Court of Appeal issued a decision in another case which held that a superior court judge could not declare a mistrial because the parties exceeded their time estimate unless there is a local court rule that notified the parties of this possibility. (Blumenthal v. Superior Court (2006) 137 Cal.App.4th 672 [40 Cal.Rptr.3d 509].) The local rules for the family law division of the Sacramento County Superior Court were amended after the Blumenthal decision and after the Carlsson trial authorizing the court to declare a mistrial if the parties exceed their time estimate.

 Mr. Moore had to withdraw from the venture in July 2002, when he was recalled to active duty in the service. The Moores signed over their interests to the Carlssons and Minkoffs. Mr. Carlsson testified that he then entered into a partnership agreement with Joseph Mayo whereby Mr. Mayo invested time and money into the renovation in exchange for an interest in the fourplex. The existence and terms of this agreement were issues in dispute at the trial.

 Ms. Joy testified that during a break she overheard an ex parte conversation between Judge McBrien and Ms. Keeley questioning Ms. Huddle’s competence. We defer to the masters’ finding that this allegation was not proven.

 This should not be construed as suggesting that removal may never be warranted based on multiple incidents of misconduct within the context of one case. In fact, removal may be based on a single act of serious misconduct. (Inquiry Concerning MacEachern (2008) No. 184, Decision and Order Removing Judge from Office, p. 19 [49 Cal.4th CJP Supp. 289, 307].)